Call the case of U.S. v. Hill and Mr. Greenlee whenever you're ready to proceed. Good morning, your honors, and may it please the court. My name is Andrew Greenlee, and I'm here on behalf of the defendant, Robert Hill. I intend to discuss the probationary search issue, and I'll leave the remaining issues to my co-counsel. Your honors, a home condition of his probation to allow his own probation officer to conduct a home visit. It's not the same thing as allowing any officer at any time for any reason to intrude his home. In this case, after the arrest, after the protective sweep, and after the removal of the defendants from the scene, law enforcement should have gotten a warrant. At that point in time, the government's, the government, it transformed from a supervisory function into an investigatory function. And at that point in time, there really, there was no, we know from Knights and we know from Sampson that there was a balancing test, and at that point in time, the governmental interest in supervision had really disappeared. At that point. Could I ask about that, sir? If I did not misread Knights, Griffin, and Sampson, they talk about balancing the expectation of privacy that a parolee or probationer has, and they say two things about that. Number one is the status itself, by virtue of all of the conditions of supervised release or probation, as well as, in addition to that, whatever effect, whatever language in a special condition might have been. Here we have standard condition 10, which allowed a home visit and the seizure of contraband in plain sight, not as much as what was in Knights and Sampson. But on the other hand, they were pretty clear that given the need for the state, that if you have that enhanced special need on behalf of the state, that then you get into a totality of the circumstances test and reasonableness. Isn't it true that you're not claiming that there wasn't, if not probable cause, at least reasonable suspicion after they found what they found when the agents went upstairs to effect the arrest? You're not denying that, are you? Your Honor, we would concede that there is a certain degree, a certain diminution in the expectation of privacy, simply by virtue of the fact that somebody is on probation. We recognize that. We would agree that at the point in time that they arrived upstairs, they might have reasonable suspicion, if the standard is reasonable suspicion. Where we part ways with your analysis is that in these other cases, in Griffin, Knights, and Sampson, there was a blanket waiver that any law enforcement officer at any point in time could conduct a warrantless search of the premises. In this case, we have nothing near that. We do have a home visit, but that, again, we submit that it's not the same thing. Your argument strikes me as the scope of consent argument, that he consented to a home visit but not a warrantless visit. And the Supreme Court was very clear in all of their cases, Knights, Griffin, and Sampson, that they were not reaching consent. It was a diminished expectation of privacy. And they didn't say, so for example, if you look at Sampson, there was no suspicion at all. There was no reasonable suspicion or anything. It's a very fluid test the Supreme Court seems to have articulated that once you get that lowered expectation of privacy and the heightened public policy interest, that totality of the circumstances and reasonableness kicks in. And I hear you saying something different than that. But we, again, we don't disagree that in that particular case, if you look at Sampson, the law enforcement officer knew that the person was on probation. He knew that as a condition of all California probations, he could search that person. And he expressly said, I knew that I could search that person because the California law permits it. Now, we know here from the government's own regulations and the U.S. Probation Office, their own monograph, that a home visit is a different animal from a full-blown warrantless search. The government knows how to, they know how to, as a condition of probation or parole, they know how to impose that condition. And in this case, they chose not to. That suggests that the government in its own regulations recognized that there is a, that their interest in supervising these people is less, is less than it would otherwise be if there were somebody who, for instance, were on parole than somebody who is on probation. Didn't we decide this very issue in the Bradley case? Didn't you present that case to us, this 1978 decision that had a strikingly similar condition such as this that allowed for home visits? And didn't we say there that in the absence of exigent circumstances that the officers were required to get a warrant? Your Honor, yeah. That's what the court said. Now, granted that that was before Is that case no longer good law in light of these other cases that Judge Grimm cited? I do believe that the analysis has changed slightly, but we think that it's informative insofar as once these defendants had been arrested, removed from the scene, at that point, the government's interest in the supervision of probationers, it's evaporated. There's at that point in time is the government's interest in investigating the commission of crime. And at that point, they conducted this walkthrough search. Of course, they brought along Agent Zumo, but the defendants weren't there. It wasn't a home visit because the defendants weren't even present. They conducted this intrusive walkthrough search, investigated the entirety of the premises. And then, in my view, they should have stopped. They could have been no problem to get a warrant at that point. After they've removed these people from the scene, after they've effectuated the purpose of their very home visit, they should have stopped and they should have gotten a warrant because at that point in time, it's a law enforcement function. It's no longer a function of the U.S. Probation Office supervising probationers. And for these reasons, Your Honor, I think that this court should reverse. All right. Thank you very much. Mr. Kornbrath? May it please the Court, I'm going to briefly address the dog search issue. What's important is what the defendants did not object to in this case. Clearly, the officers had a right to enter the home to effect the arrest. Clearly, the officers had a right to do the Maryland versus Bowie protective sweep through the apartment to make sure they were safe during that operation. We're not objecting to the limited items they saw in plain view when they did the Bowie sweep. They saw a few pills on a dresser. They saw a package of synthetic marijuana on the table. They saw a barker in the bathroom with a needle. All of that is indicative of personal use. It's only after they invite the probation officer upstairs and probation leads them through a second sweep that they see things that are indicative of drug trafficking. Packaging material to formulate sale quantities. Digital scales. Additional items on the coffee table in the living room. Because of the drug distribution indications, Zumo suggests that a dog be obtained. Twenty minutes later, Officer Quinn shows up with Quincy the drug sniffing dog. He does another sweep of the house. There's a high search tip by Quincy the dog. There's a tile out of place and the officers candidly admit that's when we decided to get the search warrant application. We concede that normally a dog sniff is not a search based on the place case from 1983, but that deals with out in the public, a lawfully stopped vehicle on a public throughway. The dog is just going around the vehicle. Here we have a uniformed officer in a residence with a dog on a leash. Even after place, this court in Whitehead, which was a 1988 case, found that the use of a drug sniffing dog in a protected area that has 4th Amendment protections is a search. The government makes hay of Jardines, the Supreme Court case from 2013. It's a bit of a red herring. All Jardines dealt with was the use of a drug sniffing dog on the porch, the outside curtilage. They never crossed the threshold. So to say that this was a unclear area of the law such that the officers could rely on the Davis good faith exception is just not accurate. There's clear case law that says you simply cannot use a drug sniffing dog in a 4th Amendment protected location. Unless there's any questions, I'll say. Did the fact that the probation officer had the ability to do a home visit change the decision in Jardines was you don't have a right to go up to that curtilage and bring the dog that is protected? I understand the distinction of your colleague's argument with regard to whether or not this qualified as an appropriate scope of the search. But they did have a right to be there for a home visit. And while it's not the case that you would expect them to bring a drug sniffing dog on a home visit, once they have the right to be where they were, does that change the dynamic as to whether it's a protected place in your view? Well, I think what our colleagues are saying is a home visit is quite different from a search in that a typical home visit, a probation officer knocks on the door. I'm here for a home visit. Can I come in? Barker took the stand in this case. And he said, look, I never consented to Zuma coming in. We think it's far beyond just a home visit. Thank you. Cheryl? May it please the Court, Mr. Morgan? I was appointed to this case just for oral argument. The original attorney from Miss Dunnigan was unable, for health reasons, to continue on the case. So I very much appreciate the opportunity to appear in the case for the argument. I'm here to address the argument that the government has made that even if the search were illegal and the dog sniff were illegal, there's an independent source by which this evidence would have been recovered. And therefore, it should be permitted in. This is an easy case with respect to that argument. Murray makes it an easy case, in my view, the Supreme Court decision in Murray. This Court has reaffirmed in several cases the absolute requirement that both prongs of Murray be applied. And the two prongs, of course, are that nothing in the search warrant affidavit makes reference to the illegal search or the fruits of that illegal search or any observations during that illegal search. And secondly, that the officers would have sought a warrant even without that illegal search. And of course, the second is a key. But you can call them one the first and one the second. But they're both essential. In fact, this Court has said so in classic case. We cite United States versus Moat at 513 Fed Third 395, a 2008 case. But it also said it in cases in which it permitted the fruits of the tainted search to come in. In United States versus Bullard, for example, 645 F Third 237, a 2011 case from the Fourth Circuit. They emphasized, again, that the two prongs have to be satisfied. And in Moat, what this Court specifically said in quoting from Murray is that the government must establish that no information gained from the illegal search affected either the agent's decision to seek the warrant or the magistrate judge's versus Browder, found at 462 Fed Appendix 411, February 2nd of 2012. It's an Andrews brief case. But the Court again affirmed the absolute requirement that both prongs be applied. But on occasion, we've also have omitted analysis of that second prong. I mean, what do you make of those cases? Well, when you say omitted, you mean whether they would have sought a warrant but for it. It can't be omitted. The case law is clear on that. It's simply error to omit that second one. Sometimes the analysis is conflated. And so that's when we have these excise cases come up. They ask in those cases, I'll back up one step. Murray is the classic, I'm lecturing to the, you know this far better than I am sure. But Murray didn't make any reference to Karos. And I guess that's what is a little bit confusing here. You would have thought that if the Supreme Court were intending to add an additional gloss to Karos, they would have said so. I see Karos as sort of a next step in the equation. That's sort of our excise case, whether it can be excised. But Murray is a classic case in the sense that there's a completely independent source in Murray. There's a warehouse search. They find marijuana. And after that, a completely independent confidential source tells them about this warehouse with marijuana. And therefore, it's completely attenuated from it. That's the classic independent source. The other cases that become more problematic are the cases in which there's a question about whether the law enforcement officers relied on what they found in the earlier things. And these cases, like Allen and others, go off on what it is, they go off on one or more of these factors. What it is the officers knew before they went in, before they went into the hotel room. Had they already planned to get a warrant? Had the suspects under surveillance for years and had abundant evidence of drug activity and that sort of thing? Was there a blood trail that led into the building in which they searched the filing cabinet so that, of course, they would have sought a warrant based on all of that information? Here, the excise question, again, respectfully, is an easy one. The excise question is, what if you were to eliminate these paragraphs five and six from the search warrant affidavit? Would there still be sufficient probable cause, firstly? But secondly, and more importantly, under Murray, would the officers have sought a warrant? And the answer from the officer himself who made the decision, Officer Root, is that he absolutely would not have. He says, again... Let me make sure I understand your position. So with respect to that first prong, you're conceding that excising that information still suffices to support a finding of probable cause? I do not concede that. Okay, what is it then? Why is that deficient? There's virtually no analysis, by the way, in either the report and recommendation or the district court's decision on why that would establish probable cause. I assume Your Honor is speaking about what was... This is in paragraph four of the affidavit, the paraphernalia found in the protective sweep. Of course, the preliminary part of that argument is, if they shouldn't have been there in the first place, then that goes out anyway. It's tainted from the opening of the doors, the entry into those other rooms, which is where they found the paraphernalia. Well, but they were there to execute an arrest warrant, and certainly they were entitled to conduct a protective sweep. And whatever was found or seen in plain view there shouldn't be excised from the warrant? Your Honor, respectfully, again, I don't consent that when the purpose of the visit was... And secured that they had, under the circumstances of this case, that they had the right to open that locked door and so on. I don't concede that. But back to this. The officer was asked who made the decision. This is Root. I'm looking now at the record, Joint Appendix 92, 96, and 118. And Root said that he's the one who made the decision to seek the warrant. And when asked repeatedly whether he made that And so he wasn't asked the follow-up question that you might have thought the prosecutor would have asked, which is, if you made it that time, but assume for a moment the drug dog had not been there, what would you have done? He wasn't asked that. So it's not a situation that they said to him specifically, absent the sniff from the drugs, from all the other evidence that you have seen, if that was all it was, would you have sought a warrant? In other words, the cause of... That question wasn't there. The cause of relation question wasn't asked exactly. That's right. However, he was asked specifically, did you make the decision before or after the dog sniff, out of context even of the other thing, when he said... But that doesn't help us with the notion of whether he would have. That's just not in the record. That's just not in the record. But of course, it's the government's burden to prove. And they didn't do that, as Your Honor pointed out. But also, he was asked at 118 when he made the decision to call the AUSA. And he said, again, this is just dealing with a temporal issue. And not just temporal, it's also a substantive issue, because it's after the fact of that sniff. And so I suggest, at least respectfully, that that supports the inference that the officer would not have... The fact is, did not apply for a warrant. Certainly could have applied for the warrant instead of ordering the dog sniff that took that time. He could have used his time if he had the probable cause. In other words, I don't think they can have it both ways. If he had that probable cause from the protective sweep, then he should have sought the warrant then. That's simple. But he didn't. And that tainted it. And so what I think is key about these independent source cases is, we're not going to just open things up. The first reference we see is in Silverthorne, which is very... Given Judge Gribb's question, is that if we agree with you, is the result that it goes back to the district court judge to determine whether or not the officers would have? Well, that's an interesting question, Your Honor. I mean, all of your questions are interesting. That's particularly interesting. It tends to be that way when we're sitting up here. That's right. That's a decision this court made in a case called United States v. Campbell, which again, Traxler, I think, wrote the opinion, but it was a troubling scenario. And they ordered it back for remand on factual finding, I believe, in that case. Murray also gave... That's a remedy that's possible in this case. And as I say, there is no analysis about whether the first part established probable cause. This may be a softball if it were to go back and we know what the question and answer are supposed to be. But I must say that this officer candidly said that he sought the affidavit only after the dog sniff. All right, Mr. Chairman. Oh, I'm blocking my light. I'm sorry. Thank you very much for the time. Ms. Morgan? Good morning. May it please the court, I'm Shawn Morgan. I'm here today on behalf of the government. I'd like to spend a couple moments talking to you a little bit about the factual background of the three appellants that bring us here today because I think it 2013, and it greatly informed the district court's analysis at the time that Judge Keeley wrote the nearly 35-page memorandum opinion in order that we believe was thorough and correct in every aspect of its analysis. In this case, although the lead defendant on this appeal is Robert Hill, this case really began as a result of continuing criminal activity by Eric Barker. Mr. Barker was on his third term of federal supervised release. He had two prior drug felony convictions, one from the Southern District of West Virginia, one from the Northern District of West Virginia. His second federal drug felony from the Northern District of West Virginia, he had been the subject of a revocation. His Southern District of West Virginia sentence also had resulted in a supervised release revocation. Mr. Barker had been on supervision for only nine weeks after having been released from his term of imprisonment for his prior revocation at a time when he continued to violate those conditions of release. He was unemployed. He had moved to a new residence without the permission of his probation officer. He had tested positive for drugs again. He had missed drug screens again. And the probation officer had sought and obtained an arrest warrant for him. The probation officer received information to indicate that Mr. Barker was at a residence on Phillippe Pike. There was an arrest team that sought and obtained entry to that residence to execute the warrant and find him. In the course of doing so, the arresting officers encountered two other people who were present. One behind a locked door was Megan Dunnigan, who also was on a term of federal supervised release for a drug felony conviction. The second, Appellant Hill, was in another bedroom down the hallway. He also was on a term of drug felony conviction. I take dispute with the reference that was made by Mr. Greeley that at the time the probation officer conducted a walkthrough that the appellants had been removed from the scene. The Joint Appendix at pages 91 and 92 makes clear that Officer Zumo was brought upstairs initially in order to identify Ms. Dunnigan and Mr. Hill. The appellants were present at the time of the walkthrough and had not yet been removed from the scene. I just wanted to make sure that the record was clear that there wasn't some attenuated circumstance under which the scene was secured and the probation officer then decided that he would go around and conduct a walkthrough. They had conducted the sweep by then, right? The sweep had been conducted by the arrest team while the probation officer was downstairs. I don't take issue with that. I think that's entirely appropriate. The question is what was the legal basis for the walkthrough? The legal basis for the walkthrough we think was properly analyzed by District Judge Keeley when she was addressing the issue in light of the Knight's test, the unanimous Supreme Court decision that held that you look at both whether there is a reasonable suspicion and whether there is a condition of probation or in this case a condition of supervision that would authorize the search by the probation officer. And the condition of supervision in that case is different than what we have here. It is. It is. We acknowledge. It is frankly strikingly similar to the condition in Bradley where we said that the officers needed probable cause to conduct that search. That case was submitted post-briefing via a 28-J letter and the government didn't respond which suggested to me that somehow you thought there was something to that. It's the government's position, Your Honor, that I do agree that this is similar to Bradley. The condition in Barker was a condition that we interpret differently than the appellants do. The appellants, although the language suggests that Barker shall permit a probation officer to visit him and shall permit confiscation of contraband in plain view, the appellants take the position that that requires the probation officer to ask permission in order to take a look around his residence. And the facts and circumstances surrounding this particular supervisee and this particular set of facts, to me, make clear that the district court applied the probation officer's walkthrough was completely appropriate in light of Nights and in light of Bradley. We don't dispute that the condition of release that the district court utilized at the time that Mr. Barker was placed on supervision is narrower than Nights. But we also think that Do you think that Nights overruled Bradley? I do, Your Honor. I do. And I think that the district court's analysis of Nights is the proper analysis that this court should adopt. We agree that there should be a balancing. I don't think anyone disputes that there should be a balancing between a person's reasonable expectation of privacy and the legitimate need of the probation office to conduct oversight of someone on supervision. But the district court was very detailed in its analysis of the different steps that had been undertaken by Mr. Barker during his terms of supervision that continued to diminish his expectation of privacy and continued to escalate the need of the probation office to supervise him more intensively and made clear the reason that it was completely appropriate under this set of facts and circumstances in order for the probation office to conduct that walkthrough of the residence. If we were to find that Nights, which was 2001, did supersede or trump Bradley, which I think was 1979, we still would be left with the issue of the significant difference between the language in Standard Condition 10 and the language in Nights and Samson that allowed the court to go as far as it did. In looking, if we were to look for other jurisdictions, we would come to the conclusion that the 11th Circuit and the 6th Circuit have taken dramatically different approaches in this, with the 6th Circuit a much narrower one that would seem to be problematic for the government's position in this case. But the 11th Circuit, and Judge Keeley cited the Yankovitch, which had no search condition. If we were looking to be guided by what other courts have done, circuit courts have done, in the absence of specific language in the 4th Circuit, how would you help us figure out whether we should follow the 6th or the 11th? We agree with District Judge Keeley's reliance on Yankovitch, and we would have no problem with this circuit adopting the holding in that case. In Yankovitch, the court was analyzing whether, in light of particular language in a search condition of release, that language in the condition upset the Knight's balancing test to require more than reasonable suspicion. We maintain that reasonable suspicion is the touchstone here. Why should we apply that test, given the fact that, you know, at the very beginning of this process, when negotiating terms of condition, the government is certainly free to require a term of condition similar to that in Knight's. The defendant typically is not in the best bargaining position, so why shouldn't we honor the bargain that the defendant struck in this case? That is, that he would allow home visits, but by its plain terms, the condition in this case did not allow the kind of conduct that the police conducted here. Because otherwise, it would eviscerate the probation officer's ability. No. I mean, the government could simply insist upon that as a more explicit term of condition that would allow for warrantless searches. Indeed, if he had the prior history of lack of success on supervised release that you mentioned when you started your argument, they certainly could have moved for violation and asked that to be added on the basis of the fact that he wasn't doing so well thus far. I don't disagree that, hypothetically, that could have happened. The conditions of release that were imposed at the time, including specifically condition number 10, was a standard condition that at that time was applied universally to all defendants placed on supervision. Despite the more narrow language of condition number 10 at the time that Mr. Barker was placed on release conditions, we continue to maintain that that condition did not give him free reign to avoid probation officer supervision. Factually speaking, in this case, he had effectively absconded from supervision yet again, and he was living in a location where the probation officer did not even know he was located in order to be able to supervise him. It was only because the probation officer had received that information and the search warrant was executed on February 8, 2013, that the probation officer ever was in the home visit where a probation officer would, as the defendants suggest, this probation officer should be limited, knock on the door and make an attempt to conduct an inspection. This is a circumstance where a supervisee was in violation of his release conditions again. I would say continuously would be a fair way to put it based upon Eric Barker's history of supervision with the court. In light of that, it's the government's position that the probation officer did not need permission because condition number 10 said that he shall permit a visit and he shall permit confiscation of contraband in plain view of the probation officer. It's the contraband that wasn't in plain view. It was not the paraphernalia that was sitting out there that was revealed by the dog. If we're talking about reasonableness under the circumstances, and we appreciate the emphatic tone of the Supreme Court about the need for the probation officer to be able to supervise, but the record here shows that they were on the phone with the magistrate judge. Why couldn't they have, based upon what they saw when they went in that far, gotten a telephone search warrant from the magistrate judge? They were on the phone with him right when they were there and they didn't do that. They then brought the dog in and then only after that did they seek a search warrant. If the circumstances, we look at the tally of the circumstances, then why didn't they take advantage of that golden opportunity that they had? I think there's another factor to consider as well in terms of what the officers knew at the time that Officer Zumo made his walkthrough. In addition to the drug usage paraphernalia that has been pointed out, a salient fact that Judge Keeley noted in her opinion that we believe is a compelling one that weighs in favor of drug distribution versus drug possession is the fact that when Eric Barker was taken into custody, not only had he been attempting to use drugs based upon the tourniquet and the needles that were found, but when he was patted down, he had approximately $1,300 in cash on his person. This is at a time when he had told the probation officer that he was unemployed. He was a twice convicted drug felon. When you combine that with the multiple drugs and drug paraphernalia that were seen during the protective sweep, we believe that the totality of the circumstances militates in favor of not only a finding that all three of these supervisees were participating in drug usage, but also that Eric Barker at least at that point was involved in drug distribution activity. I don't think that you answered Judge Grimm's question about why the officers didn't take advantage of the fact that they had a magistrate on the phone and had apparently sufficient cause to get a telephone warrant. I think that that would have been another way to go. I think at the time that the officers were on the phone with the magistrate, they were seeking authority to arrest Ms. Dunnegan and to arrest Mr. Hill. At the point that the arrest warrant was executed for Mr. Barker, no one had expected Mr. Hill or Ms. Dunnegan to be present. When they were found in that location, the probation officer was on the phone obtaining authority in order to be able to execute arrests on those two for their violation of their supervised release conditions and the fact that they were involved in drug usage, drug distribution and were associating with Mr. Barker and with each other when they did not have his permission to do so. In the absence of this evidence that was the paraphernalia that was discovered as a result of the arrest warrant, is it your position that the probation officer could have come to this home with a drug dog and insisted on walking through the residence with the dog absent any other evidence as part of this term of condition? I think in light of nights, he would have had to have had reasonable suspicion. Absent a warrant, I think he could have had reasonable suspicion on the basis that Mr. Barker was staying somewhere that the probation officer did not know or expect him to be staying, that he was not employed, that he was missing drug screens, that he was using drugs again because that was the pattern of Mr. Barker's behavior during his prior terms of supervision that led to revocation. But of course, Your Honor, the way that this drug dog sniff happened, this happened about six weeks before the Jardine decision came down. So it was a circumstance under which at the time that it happened, the officers were relying upon Jeffess, which is something that the district court didn't address because the test under nights and finding that there was reasonable suspicion for the walkthrough and the finding of the evidence in that circumstance that she did not need to address the drug dog sniff at all. Could you address this, the issue with respect to Murray and the second prong and the evidence, the testimony that suggests these officers, that the officer who had made the decision testified that he didn't, he wasn't going to seek the warrant until after the drug sniff, the dog sniff. I think that your questions on that point were good. I don't think that that's exactly what the officer said. I don't think he said, I wasn't going to seek a warrant until then. Or I did not seek the warrant until then. Right. What he said was, I did not seek the warrant until then. The district court in making its analysis of that issue relied upon the Allen decision from this court from 2011 at 631 Fed Third 164 and the district court in analyzing Allen and we believe it's the same analysis that would be applicable in light of Murray, considered the fact that even if you excise paragraph four from the search warrant, the remainder of the remaining evidence, and I said that wrong, even if you excised paragraphs five and six, paragraph four recites sufficient basis for probable cause in order to uphold the issuance of the search warrant. Well, that gets you to the first prong, but I don't recall that the district court ever discussed the second prong of Murray. I'm not sure that she did discuss the second prong of Murray. I think she looked at Allen and she concluded that a judicial officer of reasonable prudence would conclude that the apartment was going to likely contain exactly the evidence that it did, evidence of additional contraband, illegal drugs, and evidence of the crime of drug distribution. Well, then it appears the analysis is incomplete, so why shouldn't we, if we think Murray is good law, send it back? I think that there's a separate reason that you could avoid doing that. If you look at the totality of the facts and circumstances in this case and you look at the items that were seized relative to the search warrant, everything except the baggie of heroin that was found in the ceiling tile is something that was seen in plain view before Officer Zumo ever walked through, before the canine sniff. We believe that the inevitable discovery doctrine would be an independent basis on which you could uphold the seizure of the items in the case. It's the government's position that there was no error in this case whatsoever by District Judge Keeley, that there's no reason to remand that the memorandum of opinion that she issued and her order denying the motions to suppress was a correct opinion in all respects, and we believe that it should be upheld on its face and that there's no need for remand. Thank you very much. Warren Burr, do you have some rebuttal? It's the defendant's position that the Fourth Circuit case Bradley need not be overturned because it's on four points with the Supreme Court case law. The common thread between Knights and Griffin and Sampson is the condition of supervision. It's the salient factor that the Supreme Court relies upon. All Bradley said was, your condition of supervision allowed only home visits. It didn't allow the officer to go into the home and conduct a full search, so Bradley is actually on par with the subsequent case law that came out at least nine years later. But Bradley didn't go through the analysis that was done in Griffin about the mere status of being on supervised release as diminishing the expectation of privacy, and that's the starting point that is there before you even get to look at the condition. So it would seem to me that even if Bradley has some consistent analysis of the condition that you can't say it's not affected by the subsequent Supreme Court case law, can you? Well, clearly Bradley didn't highlight the condition the way the Supreme Court did in the other three cases. But what we don't have any case of, perhaps this is one, where you have, if you're looking at the two aspects that diminish the expectation of privacy on behalf of the individual, one is the status alone and the other one is the nature of the condition. We have a difference in the nature of the condition here that is, that has perhaps enhances the expectation of privacy. What we don't have any guidance on is when those, is there a sufficiently reduced expectation of privacy on the virtue of the status in and of itself that allows us to then go to the totality of circumstances because the state's special need remains the same. Our position would be you cannot. The salient factor has to look at the condition at issue. Bradley dealt with a home visit. I think we cite the Henry case from the Sixth Circuit, which was a home visit condition. It's not a full-blown search. Yakovitch, he argued that while the officers had a right to visit him, they couldn't search the computer. That was your traditional, officers at the door, they knock, it takes Yakovitch 10 minutes to answer the door, and they come in. So Yakovitch really shouldn't have been relied upon by the court for that particular point. Back to paragraph four of the search warrant application, that's the point in time when ZUMO comes in. In other words, the sweep had already taken place. The officers found limited items indicative of drug usage only. Paragraph four is when ZUMO comes in and does the second search. So if you find that the home visit condition did not allow ZUMO's actions, even paragraph four has to come out. We think five or six are much easier, because the dog sniff was just off the boards. Thank you. All right, we're going to come down and greet counsel, then take a brief recess before moving on to our next two cases. This court will take a brief recess.
judges: Albert Diaz, Stephanie D. Thacker, Paul W. Grimm